**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

───────────────────────────────

**BRIAN RUSK,**

                        **Plaintiff,**                **10-CV-0544A(Sr)**

**v.**

**NEW YORK STATE THRUWAY AUTHORITY, et al.,**

                **Defendants.**

───────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

        This matter was referred to the undersigned by the Hon. Richard J.

Arcara, in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and

report upon dispositive motions.  Dkt. #5


        Currently before the Court is plaintiff's motion for partial summary

judgment (Dkt. #46) and defendants' motion for summary judgment (Dkt. #47).  For the

following reasons, it is recommended that plaintiff's motion be denied and defendants'

motion be granted.


## PROCEDURAL BACKGROUND

        Plaintiff commenced this action on April 9, 2010 against the New York

State Thruway Authority in New York State Supreme Court, Erie County by filing the

original complaint dated March 31, 2010 with the Clerk of Erie County.  Dkt. #1, ¶2.  On

May 28, 2010, plaintiff filed an Amended Complaint adding Thomas Pericak, Michael Fleischer and Donna Luh as defendants.  *Id*. at ¶5 and Exhibit C thereto.  Defendants filed a Notice of Removal with this Court on June 29, 2010.  Dkt. #1.

## FACTUAL BACKGROUND

### Plaintiff's Employment with the New York State Thruway Authority

In his Complaint, plaintiff, Brian Rusk alleges that he began his employment with the New York State Thruway Authority ("NYSTA") in 1996 as an "Assistant Public Information Officer."  Dkt. #1, Exhibit C, ¶9.  Defendants maintain that the title of plaintiff's initial position was "Assistant Public Relations Officer," which was later changed to Assistant Public Information Officer in May 1999.  Dkt. #63, ¶1.  The parties agree that at the time of his termination, February 11, 2010, plaintiff was a Grade 23 employee and was earning approximately $87,000.  Dkt. #48, ¶¶ 5 and 7. The parties further agree that plaintiff did not hold a policymaking position and was not involved in policymaking activities.  Dkt. #46-8, ¶2; Dkt. #63, ¶2.  However, the parties disagree whether plaintiff was classified as an exempt employee and further, whether plaintiff, as an exempt employee, was entitled to a hearing under New York Civil Service Law § 75(1)(c) prior to his termination.   Defendants state that at the time of his termination, plaintiff's job was classified as exempt, and further maintain that it is irrelevant whether plaintiff, as an exempt employee, was entitled to a hearing under New York Civil Service Law § 75(1)(c).  See Dkt. #48, ¶4; Dkt. #63, ¶¶2 and 5.

According to NYSTA personnel records, plaintiff's position was designated as Managerial/Confidential.  Dkt. #63, ¶6.  Plaintiff disagrees and asserts that he was not a "Management Confidential" employee and did not perform the functions of a "Management Confidential" employee.  Dkt. #46-8, ¶11.  Plaintiff testified that he was hired to create special events, speeches, and public outreach to improve the NYSTA's image.  Dkt. #48, ¶9.  Plaintiff further testified that he did, in fact, set up speaking engagements, press conferences, and features in the newspaper.  *Id*. at ¶10.  During his employment with the NYSTA, plaintiff reported to the Division Director.  *Id*. at ¶12.


**Individual Defendants - Duties and Responsibilities**

For twelve of the fourteen years plaintiff was employed with the NYSTA, the Division Director was William Leslie, thereafter, the Division Director was defendant, Thomas Pericak.  *Id*. at ¶13.  According to defendants, defendant Pericak, "did not have any responsibility, nor was he authorized, to set policy for the NYSTA concerning termination of employees."  *Id*. at ¶15.  Plaintiff disputes the foregoing statement arguing,

> Defendant Thomas Pericak, NYSTA's Buffalo Division Director responsible for the supervision of the NYSTA's Buffalo office, who regularly communicated with NYSTA Executive Director Fleischer, was involved in and made recommendations during NYSTA's discussions involving Plaintiff's employment prior to Plaintiff receiving discipline.  A genuine issue of material fact remains [sic] Defendant Pericak was responsible for setting NYSTA policy by way of his actions, conduct and recommendations as a Division Director, particularly where Pericak admits he was asked to voice his opinion and recommendation to Fleischer, Barr

>and others regarding how, if at all, to discipline Plaintiff and
>that he did so.

Dkt. #65, ¶3.  Defendant Michael Fleischer was the Executive Director at the NYSTA at

the time of plaintiff's termination.  Dkt. #48, ¶16.  Again, the parties dispute whether

defendant Fleischer was responsible for setting NYSTA policy by way of his actions,

conduct and recommendations as Executive Director.  Dkt. #65, ¶4. Specifically,

plaintiff states,

>Defendant Fleischer is an Executive Director for NYSTA.  He
>oversees NYSTA's entire operations statewide.  He was
>involved in, and made recommendations during, NYSTA's
>discussions involving Plaintiff's employment prior to Plaintiff
>receiving discipline, and, Pericak's notes confirm that no
>disciplinary action was taken against Plaintiff until Fleischer
>made a decision.

*Id*.  Finally, with respect to defendant Donna Luh, defendant Luh is a NYSTA Board

Member and according to defendants, she "did not have input into policies concerning

the hiring and termination of employees, such as Rusk."  Dkt. #48, ¶19.  In response,

plaintiff states, "NYSTA's Board concededly sets NYSTA policy.  Defendant Luh is an

agent of the Board.  An issue of material fact exists regarding whether Luh, by virtue of

her own conduct, sets policy for Defendant NYSTA."  Dkt. #65, ¶5.


**Termination of Plaintiff's Employment with NYSTA**

According to defendants, John Barr is and was at the time of plaintiff's

termination the Director of Administrative Services for the NYSTA.  Dkt. #48, ¶20.  At

the time of plaintiff's termination, Thomas Fitzgerald was the Director of Human

Services and John Buono was the Chairman of the NYSTA's Board of Directors.  *Id*. at

¶¶21-22.  Defendants describe that as the Chairman, "John Buono had the ability to set

the agenda of the NYSTA Board, including the [sic] scheduling meetings in which

NYSTA policies were established, and the content of such policies."  *Id*. at ¶23.

Moreover, defendants state that NYSTA former Chairman John Buono delegated

authority to John Barr to terminate employees.  *Id*. at ¶24.  Plaintiff maintains that,

> [a] genuine issue of material fact remains in dispute
> regarding who or whom from NYSTA actually had or has the
> authority to terminate employees, and in this case who or
> whom from NYSTA had authority to decide, and did in fact
> make the final determinative decision on behalf of the
> NYSTA, that Plaintiff be terminated, regardless of whatever
> human resource, administrative or ministerial function John
> Barr, NYSTA's Director of Administrative Services, plays or
> played in "effectuating" such dismissals, including Plaintiff's
> dismissal, particularly since here, Defendants concede that
> Defendants Fleischer and Pericak, as well as Kevin Allen
> (former NYSTA acting Director of Audit and Management
> Services), Thomas Fitzgerald (NYSTA Director of Human
> Resource Management) and Daniel Gilbert (former NYSTA
> Chief of Staff), conferenced and consulted together more
> than once regarding Plaintiff prior to his termination.

Dkt. #65, ¶7.  It is defendants' position that John Barr terminated plaintiff on February

11, 2010, consistent with the authority vested in him by NYSTA Chairman and NYSTA

Bylaws.  Dkt. #48, ¶29; Dkt. #52, ¶¶5-6 and Exhibit A thereto.  In particular, §4 of the

NYSTA delegation entitled "Delegation of Authority Appointment and Removal Power

for Thruway Authority" provides that:

> The Director of Administrative Services is authorized, upon
> prior notice to the appropriate Department Head or Division
> Director, to effectuate disciplinary action or to enter into
> stipulations with employees with respect to disciplinary
> actions and to notify charged parties accordingly.  Any such
> action by the Authority's Director of Administrative Services

shall require approval of the Executive Director for all
employees in positions allocated to Grade 27 or higher.

Dkt. #52, Exhibit A.


**Plaintiff's Outside Employment**

Plaintiff asserts that he "competently and professionally performed the
duties associated with his position at all times throughout his employment." Dkt. #46-8,
¶13. Moreover, plaintiff states, "[p]rior to assuming his position with NYSTA, Plaintiff
made NYSTA aware of his outside employment activities and his desire to continue
doing same. After receiving said approval from NYSTA, Plaintiff remained in his
position through the tenures of three (3) separate NYSTA Board Chairs and for over a
decade without incident." *Id*. Conversely, defendants state, "plaintiff did not
competently and professional [sic] perform the duties associated with his position at all
times insofar as the New York State Office of the Inspector General found that plaintiff
used NYSTA time and resources for his own business gain." Dkt. #63, ¶12. Moreover,
defendants maintain that NYSTA policies forbid plaintiff from using public resources for
his personal gain. *Id*. at ¶13.


It is undisputed that at all times during his employment, plaintiff held
outside employment as a public relations consultant. Dkt. #1, Exhibit C, ¶13; Dkt. #48,
¶30. Plaintiff signed a Notice of Extra Employment or Outside Activity on March 7,
1998, wherein he acknowledged that he was prohibited from performing, "the work or
activity on Authority time or use Authority facilities, equipment, materials, computers,

programs or data bases without prior approval."  Dkt. #48, ¶31.  The NYSTA

"Telephone Service Use Policy" provided: "Authority/Canal telephone service shall be

used for official business.  Prudent use of phones for essential local calls is permitted.

However, such calls shall be limited in number and of short duration."  Dkt. #48, ¶32.

Moreover, the policy specifically prohibits the use of Authority/Canal telephones for

"engaging in personal business or gain."  *Id*. at ¶32.  Indeed, plaintiff testified that he

understood that the Telephone Service Use Policy prohibited him from using his

NYSTA telephone for personal business or gain.  *Id*. at ¶34.


> Plaintiff describes his duties as follows,
>
> interacting with community and media representatives to
> schedule, organize and arrange for public relations events
> with various community groups, create and/or attend public
> relations meetings for NYSTA, accept and log phone
> inquiries, provide a better understanding of NYSTA
> objectives by responding to patrons and elected officials, set
> up media events for proactive NYSTA projects, assist with
> public outreach through press conferences, public forums
> and speaking engagements in conjunction with area
> community groups, coordinate the SEFA program for
> NYSTA's TWY/Canal Buffalo Division, and organize and
> administer NYSTA's fund-raising activities for the United
> Way, among other things.

Dkt. #46-8, ¶16.  Although defendants object to plaintiff's unsupported allegations,

defendants admit that plaintiff was required to interact with media, organize, arrange

for, and set up public relations events, and create and/or attend public relations

meetings on behalf of the NYSTA.  Dkt. #63, ¶16.  However, defendants deny that

plaintiff's duties required him to organize and administer NYSTA fund-raising activities

for the United Way and coordinate the SEFA program for the NYSTA.  *Id*.  Plaintiff

further asserts that in order to accomplish his duties and objectives for the NYSTA,

> [he] was required to interact extensively with community
> leaders and organizations to establish NYSTA contacts and
> relationships, set up meetings, public forums and speaking
> events, and otherwise correspond with valuable
> constituencies.  Among the area business leaders and
> professionals that Plaintiff's positions at NYSTA
> necessitated that he reach out to were persons and
> businesses for whom Plaintiff also, from time-to-time,
> performed private, public relations consulting work during his
> personal time, and outside of his required NYSTA work
> hours.

Dkt. #46-8, ¶17.  Defendants deny that plaintiff's position with the NYSTA necessitated

that he reach out to his private clients in order to fulfill his NYSTA job duties.  Dkt. #63,

¶17.


**Office of Inspector General Investigation**

Defendants assert that on September 2, 2008, the State of New York

Office of the Inspector General received a complaint alleging that Brian Rusk operated

a public relations business on state time and used a state telephone to do so.  Dkt. #48,

¶35.  Plaintiff maintains that a genuine issue of material fact exists concerning when the

Office of Inspector General received a complaint and more specifically, what form the

complaint took and the substance of the complaint.  Dkt. #65, ¶13.  Plaintiff asserts that

the complaint against him "probably came from those sources to get rid of me to get the

money to pay Mr. E[a]gan."  Dkt. #48, ¶36.  Alternatively, during his deposition, when

asked whether he knew for a fact that the complaint did not come from Mr. Korn (one of

plaintiff's former clients), plaintiff testified, "It may have been, I don't know.  I would like

to know." Dkt. #65, ¶14.  With respect to the NYSTA's hiring of Eagan, plaintiff also testified that the "only way they could fund Mr. E[a]gan's $92,000 salary is they had to get it from one pocket to pay the other because that was the motivation" and that "the only way they could come up with $90,000 for the new employee was to find it somewhere else and that's why I maintain the complaint against me came from those sources to get rid of me to get the money to pay Mr. E[a]gan." Dkt. #48, ¶37.

In its Final Report Pending Agency Response dated January 27, 2010, the Office of the State Inspector General ("OIG") states, in part, "As a result of his obtaining express approval from his supervisors, Rusk's outside employment is not, in and of itself, improper.  Rather, Rusk's misconduct stems from conducting his personal business during state time and using state resources to further these personal ventures." Dkt. #52, Exhibit C.  As part of its investigation, the OIG reviewed Rusk's bank records for the period January 1, 2008 through July 2009, and that review revealed significant check deposits, $87,410, into Rusk's personal bank account from the following private clients, Advanced Cardiac Surgical Associates, PLLC ($12,240); Anthone Eye Center ($8,160); Buffalo Plastic Surgery ($20,970); Campanella Orthotics & Prosthetics ($8,840); American Friends of Assaf Harofeh Medical Center ($5,950); Appaloosa Productions LTD ($1,350); Batavia Nursing Home ($1,750); Branford Castle ($25,000); Fairchild Manor Nursing Home, LLC ($2,100) and Ronald Plewniak ($1,050). *Id*.

In addition, the OIG reviewed the call usage records for Rusk's state-assigned telephone for the period January 2008 through June 2009 and compared those records with Rusk's bank records for payments from private clients.  The comparison revealed the following number of calls between Rusk and his private clients, Buffalo Plastic Surgery, 316 calls; Campanella Orthotics & Prosthetics, 264 calls; Anthone Eye Center, 130 calls; Appaloosa Productions LTD, 53 calls; Advanced Cardiac Surgical Associates, PLLC, 5 calls; Branford Castle, Inc., 24 calls; Fairchild Manor Nursing Home, LLC, 87 calls; Batavia Nursing Home, LLC, 20 calls; and Ronald Plewniak, 180 calls.  *Id*.  In addition to the foregoing, the OIG investigation revealed that Rusk also made 400 telephone calls to Alidi Travel, Inc. and 135 telephone calls to the Management Company associated with Assaf Harofeh, Batavia and Fairchild Nursing Homes.  *Id*.  Further investigation of the calls revealed that Rusk conducted his private business during state time, including the use of his personal cellular telephone during work hours.  The Report notes that although the individual calls were relatively short in duration, the cumulative time spent on the calls was significant.  *Id*.

According to the OIG Final Report Pending Agency Response, Rusk claimed that his telephone usage was "limited in number" and "incidental."  Dkt. #48, ¶54.  In addition, by his counsel, Rusk "posited that any single entity that received less than 100 phone calls was, in his view, 'incidental'."  *Id*.  According to the Final Report, the OIG stated, "Rusk's justification and expansive definition of "incidental use" ignores clear state and TA policy and only serves to confirm his excessive use of state resources to further his personal ends."  *Id*. at ¶56.  Indeed, Rusk asserted that a

significant portion of the calls related to charitable and humanitarian activities and he asked that the OIG "[a]ssum[e] that 33% of the calls to entities are called associated with [these] non-compensated activities." *Id*. at ¶57. In the report, the OIG said that "[i]n addition to failing to justify the other 67% of his calls in furtherance of his private business, Rusk lack[ed] authority to perform charitable activities not sponsored and approved by [NYSTA] during [NYSTA] work hours using authority resources." *Id*. at ¶58. Finally, the OIG concluded that Rusk's efforts to suggest that his work with the NYSTA required him to interact with his business clients to the benefit of the NYSTA and further, that a significant portion of his contacts with his private business clients was to establish community contacts that benefit NYSTA, were self-serving and unavailing. *Id*. at ¶¶62-63.

Ultimately, the OIG concluded that Rusk operated a public relations consulting business in addition to his employment with NYSTA and that Rusk used his state-issued telephone in furtherance of this outside employment. Dkt. #48, ¶63. In addition, the report concluded that Rusk conducted his private business during state time. *Id*. at ¶66. Therefore, it was the OIG's recommendation that the NYSTA take appropriate disciplinary action against Rusk.

**NYSTA's Response to the OIG Final Report Pending Agency Response**

On December 10, 2009, the OIG advised the NYSTA that it had

completed its investigation of plaintiff and "concluded that he operated a public relations

consulting business in addition to his employment at NYSTA and used his NYSTA

telephone and personal cell phone during office hours to conduct such business, in

violation of NYSTA policies."  Dkt. #48, ¶70.  According to defendants,

> Upon learning of the OIG investigation and findings from Ms.
> Boehm [an Investigator for NYSTA's Department of Audit
> and Management Services], Thomas Fitzgerald consulted
> with Defendant Fleischer, Mr. Barr, Mr. Daniel Gilbert,
> former NYSTA Chief of Staff and Mr. Kevin Allen, former
> NYSTA Acting Director of Audit and Management Services
> about how the NYSTA should respond to the OIG findings.
> Messrs. Fleischer, Barr, Gilbert, Allen and Fitzgerald wanted
> Thomas Pericak, Buffalo Division Director and Plaintiff's
> immediate supervisor, to be involved in the discussions
> concerning this matter so on or about December 15, 2009,
> Mr. Pericak was advised of the OIG's findings.

*Id*. at ¶¶71-72.   Plaintiff maintains that there is a genuine issue of material fact

concerning,

> ***when*** NYSTA representatives, including Defendant
> Fleischer, Defendant Pericak, Mr. Barr, Mr. Buono, Mr.
> Gilbert and Mr. Fitzgerald, as well as Defendant Luh,
> learned about and/or were informed of the OIG's
> investigation of Plaintiff, the details regarding same, and
> Plaintiff's whistle blower complaints to the OIG about William
> Eagan.  This is particularly the case where Jeffrey Hagen,
> OIG Investigative Counsel, made clear to George Rusk that
> he was communicating with NYSTA throughout his
> investigation and reporting that which Plaintiff disclosed to
> them, and, since Plaintiff and Defendant Luh discussed the
> OIG's investigation in June 2009 and Defendant Fleischer
> admits the NYSTA Board was briefed on same.

Dkt. #65, ¶18 (emphasis in original).

According to defendants, defendant Pericak initially suggested that a suspension, rather than termination would be appropriate, and further proposed that the NYSTA not take disciplinary action until the Inspector General issued a formal report, detailing its investigation and findings.  Dkt. #48, ¶73.  Thereafter, Pericak was directed to meet with plaintiff and give him an opportunity to resign.  *Id*. at ¶74.  Defendant Pericak met with plaintiff on December 16, 2009 and offered him the option of resigning and advised him that termination was likely.  *Id*. at ¶75.  Defendant Pericak conferred with plaintiff again on January 8, 2010 and reiterated that termination was likely.  *Id*. at ¶76.  The OIG sent its OIG Final Report Pending Agency Response dated January 29, 2010 to Michael Fleischer in a letter dated January 29, 2010.  *Id*. at ¶77.  Plaintiff asserts that genuine issues of material fact exist with respect to,

> *who,* John Barr or Defendant Fleischer, if anyone, directed Defendant Pericak to meet with Plaintiff regarding the allegations against him, *when* Pericak was directed to do so, if at all, and *why*, particularly given the timing of Plaintiff's termination and Pericak and Fleischer's receipt of George A. Rusk's written December 31, 2009 whistle blower complaint, asserted on behalf of Plaintiff, and, Pericak's admission that he did not ask Plaintiff to resign until within days of his termination and *after* he admittedly was made aware that Plaintiff had made a complaint regarding Eagan's hire at double pay, contrary to that which is asserted by Barr, Fleischer and others.  Additional genuine issues of material fact exist regarding whether, at any time prior ro Plaintiff's termination, Defendant Pericak was directed to speak with Plaintiff about discipline, what Pericak was directed to say, and why.  Whether the likelihood of termination was ever discussed with Plaintiff or mentioned to him by Pericak prior to his termination remains a disputed material issue.

Dkt. #65, ¶19.  Moreover, plaintiff also maintains,

> A genuine issue of material fact remains disputed regarding whether Pericak, on or about December 16, 2010 [sic] offered Plaintiff the option of resigning and advised that termination was likely.  Plaintiff was never told, by Pericak or any other representative of NYSTA, that termination was likely until the day he was actually let go.  Defendant Pericak told Plaintiff in early December 2009 that there had been conversations between the OIG's office and the NYSTA and that either there would be discipline or firing.  Plaintiff was never asked by Defendant Pericak, or anyone else at NYSTA, to resign or be fired until the day of his termination. Defendant Pericak never told Plaintiff that termination was likely.

*Id*. at ¶20.


**Plaintiff's "Whistle blower" Complaints**

For the period May 2009 through January 2010, plaintiff was represented by his brother, George Rusk, Esq.  Dkt. #68, ¶¶2-3.  On May 22, 2009, plaintiff and George Rusk met with Jeffrey Hagen at the NYSTA's Buffalo Office.  *Id*. at ¶5.   During that meeting, Mr. Hagen advised plaintiff that a "tip" to his office had triggered the OIG investigation.  *Id*.  Thereafter on September 17, 2009, on behalf of plaintiff, George Rusk met alone with Mr. Hagen.  *Id*. at ¶6.  According to George Rusk,

> I informed Mr. Hagen, and provided written, confirming documentation, on behalf of Plaintiff, that in March 2009, William Eagan (a prominent and active member of the Democratic Party), had been appointed by NYSTA to a position that entailed right of way and other ministerial duties, was not a program director position and did not entail supervision of anyone, at a double salary of $92,000 per year, despite the fact that said position had, or should have had, a starting salary of less than one-half that.  I further disclosed, on behalf of Plaintiff, that William Eagan was the brother of James Eagan, head of the transition team for

> Malcolm Smith, the new (Democratic) Majority Leader for the
> New York State Senate.

*Id*. at ¶7.  Thereafter, in an effort to cooperate with the investigation, Rusk's attorneys

submitted several letters and documents on plaintiff's behalf clarifying plaintiff's

position, as well as attempting to invoke the whistle blower protections of New York Civil

Service Law 75-b.  Dkt. #68, pp.6-35.

> According to plaintiff,
>
> In a letter dated December 31, 2009 to Office of the
> Inspector General, George Rusk provided extensive details
> on behalf of Plaintiff regarding the politically motivated and
> apparently illegal hiring of William Eagan.  In the letter, and
> as a follow-up to an August 2009 interview during which
> these issues were raised, he specifically requested whistle-
> blower protection for Plaintiff and stated that retaliation for
> reporting the Eagan hiring was likely to occur.

Dkt. #46-8, ¶23.  Plaintiff testified during his deposition that by the time George Rusk

wrote his December 31, 2009 letter, plaintiff was already being asked by the NYSTA to

resign.  Dkt. #48, ¶136.  Moreover, according to John Barr, defendant Fleischer,

Thomas Fitzgerald and defendant Pericak, at no time during the discussions about

plaintiff did the hiring of William Eagan and/or plaintiff's alleged whistle blower

complaints about the hiring of William Eagan figure into the decision to terminate

plaintiff.  Dkt. #48, ¶138.

## DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted); *see also*, *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162,167 (2d Cir. 1991).

A fact is considered to be "material" only if it "might affect the outcome of the suit under the governing law . . . ," and a dispute regarding a material fact is considered to be genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Bryant v Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991) and *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted).   A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).  The court's role in ruling on a summary judgment motion is not to resolve issues of fact, but rather to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  When "little or no evidence may be found in support of the nonmoving party's case . . . [and] no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Resid. Servs., L.P.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

## Application of Section 75(1)(c) of New York's Civil Service Law

By his motion, plaintiff seeks summary judgment on his first and fifth causes of action.  Plaintiff's first cause of action asserts a violation of his rights to

procedural due process pursuant to Title 42, United States Code, Section 1983 and

plaintiff's fifth cause of action is for a violation of his rights under Section 75(1)(c) of the

New York State Civil Service Law.

> Section 75(1)(c) of the New York Civil Service Law provides,
>
> 1. Removal and other disciplinary action. A person described in paragraph (a) or paragraph (b), or paragraph (c), or paragraph (d), or paragraph (e) of this subdivision shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section.
>
> (c) an employee holding a position in the non-competitive class other than a position designated in the rules of the state or municipal civil service commission as confidential or requiring the performance of functions influencing policy, who since his last entry into service has completed at least five years of continuous service in the non-competitive class in a position or positions not so designated in the rules as confidential or requiring the performance of functions influencing policy . . .

N.Y. Civ. Serv. Law § 75(1)(c) (McKinneys 1986).  The question before this Court is

whether plaintiff was an employee holding a position in the non-competitive class of

service.  As provided in the New York Code of Rules and Regulations, plaintiff's

position as an Assistant Public Information Officer at NYSTA was classified as exempt.

As explained by defendants in opposition to plaintiff's motion,

> the New York Code or [sic] Rules and Regulations ("NYCRR") provides that "[p]ositions in the exempt class are those, other than unskilled labor positions, for which competitive or noncompetitive examinations or other qualification requirements are not practicable." 4 NYCRR § 2.1 (a). It further provides that "[p]ositions in the exempt class shall be listed in Appendix 1 of these rules and made a

part hereof." 4 NYCRR § 2.1(b).  Appendix 1 to the rules
specifically list the position of Assistant Public Information
Officer for NYSTA as exempt. 4 NYCRR Appx. 1; see also
Barr Dec. (Doc. # 52) ¶ 8; Fitzgerald Dec (Doc. # 50) ¶ 16.

Dkt. #60, p.4.  Indeed, New York Civil Service Law § 75 has no application whatsoever

to exempt positions.  Under New York Civil Service Law §75,

> [t]he right to a pre-termination hearing is limited to (a)
> persons holding a position in the competitive class, (b)
> military veterans holding a position in the classified service,
> (c) persons holding a position in the non-competitive class
> for five continuous years, (d) persons holding a position as a
> homemaker or home aide in the non-competitive
> class in New York City for three continuous years, and (e)
> persons holding a position as a police detective for three
> continuous years.

*Wheeler v. Parker*, 546 F.Supp.2d 7, 10 (N.D.N.Y. 2008) (citing N.Y.Civil Service Law §

75(1)).  New York Civil Service Law § 40 provides for four distinct civil service

classifications, exempt, non-competitive, labor and competitive.  Therefore, by the clear

language of the Civil Service Law itself, exempt classification is separate and distinct

from the non-competitive class.  There can be no dispute that plaintiff's position,

Assistant Public Information Officer, was not named in the non-competitive class in the

rules.


In an effort to salvage his claims and convince this Court to recommend

that summary judgment be granted to plaintiff on his first and fifth causes of action,

plaintiff relies on two over-fifty year old New York State Appellate Division cases for the

proposition that "it is not the title, but the duties which control in determining civil service

categories."  Dkt. #78, p.2.  Indeed, plaintiff argues, that he "behaved, in all practical

and meaningful ways based on the duties and functions he performed for NYSTA, like a non-competitive civil service employee." *Id*.  Here, plaintiff simply cannot satisfy his burden to establish that his exempt position fell within Civil Service Law § 75.  Plaintiff cannot just ignore the dispositive fact that his position was not in the non-competitive class and that New York's Civil Service Law § 75 applies only to "an employee holding a position in the non-competitive class."  Moreover, plaintiff has offered nothing to contradict the evidence that his employment was in the non-competitive class.  Accordingly, plaintiff does not have a private right of action under New York Civil Service Law § 75 and was not entitled to a hearing under the statute.  For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment on his fifth cause of action be denied and defendants' motion for summary judgment on plaintiff's fifth cause of action be granted.


**Plaintiff's Due Process Claim**

            For reasons not unlike those applicable to plaintiff's fifth cause of action discussed above, this Court recommends that plaintiff's motion for summary judgment on his first cause of action be denied and defendants' motion for summary judgment be granted.  In his first cause of action, plaintiff claims that his termination without an opportunity to be heard resulted in a deprivation of his protected property interest in his employment and constitutes a violation of his Fifth Amendment right to due process.  Even assuming plaintiff could maintain a claim under the Fourteenth Amendment, plaintiff's procedural due process claim must fail as a matter of law because as set forth above, plaintiff was an "exempt" employee pursuant to section 41 of the New York Civil

Service Law.  Plaintiff's employment with the NYSTA was terminable at will and therefore, absent a property interest, plaintiff cannot sustain a due process claim. Accordingly, this Court recommends that plaintiff's motion for summary judgment on his first cause of action be denied and that defendants' motion for summary judgment on the same claim be granted.

### Plaintiff's Second Cause of Action

In his second cause of action plaintiff alleges that defendants terminated him in retaliation for his expression of concern over the NYSTA hiring practices and therefore, violated his right to free speech under the First Amendment.  Specifically, plaintiff alleges that both he and his brother complained to the Inspector General about the NYSTA's "corrupt and illegal practices" in hiring William Eagan.  As a threshold matter, to be protected, speech must be made as a private citizen, and not as part of official duties.  "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

> To survive a motion for summary judgment on a First Amendment retaliation claim, the plaintiff must present evidence which shows " '[1] that the speech at issue was protected, [2] that he suffered an adverse employment action, and [3] that there was a causal connection between the protected speech and the adverse employment action.' " Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir.2000) (alterations in original) (quoting Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir.1994)). Further, "the causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse

> employment action." Blum, 18 F.3d at 1010. Even if the
> plaintiff demonstrates these factors, the defendant can *252
> still prevail on a motion for summary judgment if it can show
> that it would have taken the same adverse employment
> action " 'even in the absence of the protected conduct.' " Id.
> (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,
> 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

*Cotarelo v. Village of Sleepy Hollow Police Dept.*, 460 F.3d 247, 251 (2d Cir. 2006).


Here, for a myriad of reasons, plaintiff's claim that defendants retaliated

against him for his speech fails as a matter of law. First, where, as here, a public

employee makes statements pursuant to his official duties, he is not speaking as a

citizen for purposes of the First Amendment and therefore, is not entitled to protection

from employer discipline.

> When a citizen enters government service, the citizen by
> necessity must accept certain limitations on his or her
> freedom. See, e.g., Waters v. Churchill, 511 U.S. 661, 671,
> 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion)
> ("[T]he government as employer indeed has far broader
> powers than does the government as sovereign").
> Government employers, like private employers, need a
> significant degree of control over their employees' words and
> actions; without it, there would be little chance for the
> efficient provision of public services. Cf. *419 Connick,
> supra, at 143, 103 S.Ct. 1684 ("[G]overnment offices could
> not function if every employment decision became a
> constitutional matter"). Public employees, moreover, often
> occupy trusted positions in society. When they speak out,
> they can express views that contravene governmental
> policies or impair the proper performance of governmental
> functions.
>
> At the same time, the Court has recognized that a citizen
> who works for the government is nonetheless a citizen. The
> First Amendment limits the ability of a public employer to
> leverage the employment relationship to restrict, incidentally
> or intentionally, the liberties employees enjoy in their

> capacities as private citizens. See Perry v. Sindermann, 408
> U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). So
> long as employees are speaking as citizens about matters of
> public concern, they must face only those speech
> restrictions that are necessary for their employers to operate
> efficiently and effectively. See, e.g., Connick, supra, at 147,
> 103 S.Ct. 1684 ("Our responsibility is to ensure that citizens
> are not deprived of fundamental rights by virtue of working
> for the government").

*Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006).  As the Supreme Court further

articulated in *Garcetti*, "the controlling factor" is whether the employee's expressions

were made pursuant to his employment duties.  *Id.* at p.421.  If an expression is

pursuant to his employment duties, it is therefore, unprotected by the First Amendment.

Here, pursuant to New York State Executive Law § 55(1) public employees, such as

Rusk,

> ... shall report promptly to the state inspector general any
> information concerning corruption, fraud, criminal activity,
> conflicts of interest or abuse by another state officer
> or employee relating to his or her office or employment....
> The knowing failure of any officer or employee to so report
> shall be cause for removal from office or employment or
> other appropriate penalty.

Even if plaintiff did not speak pursuant to his professional duties and as

required under § 55 of the New York State Executive Law, plaintiff must still

demonstrate that the matter about which he spoke was a matter of public concern.  It is

clear from the evidence before this Court, including plaintiff's deposition testimony, as

well as the letters exchanged between the Office of the Inspector General and George

Rusk, that plaintiff spoke to further his own employment concerns.  In addition, it was

plaintiff's own supposition that he was fired in order to free up the money necessary to pay Eagan his $92,000 salary.

In addition to the foregoing, in order to sustain a First Amendment retaliation claim, plaintiff has the burden of establishing that his allegedly protected conduct was a substantial motivating factor in his termination. And lastly, the NYSTA may defend its actions by demonstrating that it would have terminated plaintiff irrespective of his speech. Due to the related nature of these two assertions, the Court will address them at the same time. First, it is undisputed that the OIG investigation commenced well before plaintiff's alleged speech. Although plaintiff may question how the investigation was commenced (whether is was a complaint to the OIG from someone looking for sources of funding to pay Eagan or an unhappy former client of plaintiff), there is no dispute that the investigation commenced in September 2008.

As part of its investigation, the OIG reviewed plaintiff's bank records, records associated with calls made from his state telephone, as well as his personal telephone records. The OIG compared the deposits to Rusk's bank account to the volume, time and duration of the calls to his top ten private clients. Ultimately, the OIG concluded that Rusk operated a public relations consulting business in addition to his employment with NYSTA and that Rusk used his state-issued telephone in furtherance of this outside employment. Dkt. #48, ¶63. In addition, the report concluded that Rusk conducted his private business during state time. *Id*. at ¶66. Therefore, it was the

OIG's recommendation that the NYSTA take appropriate disciplinary action against

Rusk.

The NYSTA was advised that the OIG had completed its investigation on

December 10, 2009.   According to defendants,

> Upon learning of the OIG investigation and findings from Ms.
> Boehm [an Investigator for NYSTA's Department of Audit
> and Management Services], Thomas Fitzgerald consulted
> with Defendant Fleischer, Mr. Barr, Mr. Daniel Gilbert,
> former NYSTA Chief of Staff and Mr. Kevin Allen, former
> NYSTA Acting Director of Audit and Management Services
> about how the NYSTA should respond to the OIG findings.
> Messrs. Fleischer, Barr, Gilbert, Allen and Fitzgerald wanted
> Thomas Pericak, Buffalo Division Director and Plaintiff's
> immediate supervisor, to be involved in the discussions
> concerning this matter so on or about December 15, 2009,
> Mr. Pericak was advised of the OIG's findings.

Dkt. #48, ¶¶71-72.  Also according to defendants, defendant Pericak initially suggested

that a suspension, rather than termination was warranted, and further proposed that the

NYSTA not take disciplinary action until the Inspector General issued a formal report,

detailing its investigation and findings.  Dkt. #48, ¶73.  Thereafter, Pericak was directed

to meet with plaintiff and give him an opportunity to resign.  *Id*. at ¶74.  Defendant

Pericak met with plaintiff on December 16, 2009 and offered him the option of resigning

and advised him that termination was likely.  *Id*. at ¶75.  Defendant Pericak conferred

with plaintiff again on January 8, 2010 and reiterated that termination was likely.  *Id*. at

¶76.  The OIG sent its OIG Final Report Pending Agency Response dated January 29,

2010 to Michael Fleischer in a letter dated January 29, 2010.  *Id*. at ¶77.  John Barr

terminated plaintiff consistent with his authority vested in him by NYSTA Chairman and

the NYSTA Bylaws on February 11, 2010.  Dkt. #48, ¶29; Dkt. #52, ¶¶5-6 and Exhibit A thereto.

With respect to the timing of plaintiff's disclosures concerning the hiring of Eagan and to whom those disclosures were made, the NYSTA was not privy to any conversations between Rusk, his lawyers and the OIG before considering plaintiff's termination.  Although the record establishes that George Rusk raised concerns with OIG concerning William Eagan, neither John Barr nor the other individual defendants were aware of such concerns.  In fact, plaintiff even testified that George Rusk did not "go on the record" about these matters until December 2009, specifically, his December 31, 2009 letter.  Finally, George Rusk's December 31, 2009 letter to the OIG demonstrates that Brian Rusk had never previously raised these issues with the NYSTA.  In that letter, George Rusk states, in pertinent part, "[Brian] Rusk had not discussed the above referenced investigation with anyone in his office and certainly did not reveal any of the above details regarding the nature of your investigation," and that it was OIG's - not Brian Rusk's - decision to "place the Eagan information on the record . . ."  Dkt. #55, Exhibit F.

Lastly, the record before this Court is unequivocally clear, the NYSTA would have terminated plaintiff irrespective of his "speech."  The OIG's Final Report Pending Agency Response dated January 27, 2010, found that plaintiff had repeatedly used NYSTA time and resources for his own personal business and gain.  Specifically, the Report states, "As a result of his obtaining express approval from his supervisors,

Rusk's outside employment is not, in and of itself, improper.  Rather, Rusk's misconduct stems from conducting his personal business during state time and using state resources to further these personal ventures." Dkt. #52, Exhibit C.  Accordingly, for the foregoing reasons, this Court recommends that defendants' motion for summary judgment on plaintiff's second cause of action be granted.


**Plaintiff's Political Association Claim**

In his third cause of action, plaintiff claims that his right to political association pursuant to Title 42, United States Code, Section 1983 was violated, in that the defendants retaliated against him because of his political association.  In order to prevail on a political association claim, "a plaintiff must not only assert associational conduct of public concern, but he must also prove by a preponderance of the evidence a causal relationship between the constitutionally protected expression and retaliatory action. Dkt. #56, pp.22-23, *citing, Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) and *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003).  The record before this Court is devoid of any evidence suggesting that plaintiff was politically active at or near the time of his termination or that defendants were aware of and considered his political activities, if any, in terminating him.  The only even remotely relevant assertion made was an allegation in plaintiff's complaint that in June 2009, the political leadership of he NYSTA's Board of Directors changed from Republican to Democrat and that Rusk was and remains an active member of the Republican party.  According to defendants, "[t]he NYSTA Board is controlled by the NYSTA Chairman, who has the ability to set the NYSTA agenda, including the scheduling of meetings in which NYSTA policies are

adopted, and the content of such policies."  Dkt. #56, p.23.  Indeed, during the entire

time of the OIG's investigation into plaintiff and at the time of plaintiff's termination, the

NYSTA Chairman was a registered Republican.  In fact,

> Mr. Buono, a former Republican elected official, was
> appointed to the NYSTA by former Governor George Pataki,
> a Republican, and confirmed by the Senate, which was
> controlled by the Republican Party, in June 2002.
> Furthermore, as Donna Luh testified, for example, she was
> appointed by a [sic] Governor Patterson but confirmed by a
> Republican Senate.  But more importantly, the fact remains
> that NYSTA Board was not involved in the decision to
> terminate him.

Dkt. #56, p.24.  Notably, the only Democrat consulted about the OIG's findings was

defendant Pericak, who initially suggested that suspension, not termination, may be

appropriate.  Notwithstanding the foregoing, defendant Pericak did not have the

authority to terminate plaintiff, John Barr did.  Significantly, the declarations submitted in

support of defendants' motion for summary judgment establish that plaintiff's political

affiliation was never discussed or considered, rather, plaintiff's termination was a result

of his own misconduct.  For the foregoing reasons, this Court recommends that

defendants' motion for summary judgment on plaintiff's political association claim be

granted.

**Plaintiff's New York Civil Service Law § 75-b Claim Fails As a Matter of Law**

> [I]n order to state a claim under § 75–b, plaintiff must allege
> the following: (1) an adverse personnel action; (2) disclosure
> of information to a governmental body (a) regarding a
> violation of a law, rule, or regulation that endangers public
> health or safety, or (b) which []he reasonably believes
> constitutes an improper governmental action; and (3) a

-28-

causal connection between the disclosure and the adverse
personnel action.

*Wetzel v. Town of Orangetown*, No. 06-cv-6117, 2010 WL 743039, *17 (S.D.N.Y. Mar.

2, 2010). Specifically, Civil Service Law § 75-b(2)(a) requires a plaintiff to demonstrate

that he disclosed information that he "reasonably believes to be true and reasonably

believes constitutes an improper governmental action." Here, plaintiff's theory is

nothing more than surmise and conjecture. Moreover, it is inconceivable that plaintiff,

who himself admits that he was hired because of his political connections, could have

reasonably believed that hiring a NYSTA employee with political connections was

illegal, corrupt or an improper government action. In addition, the record is clear, at no

time did plaintiff ever provide such information to the NYSTA Board. Indeed, the record

establishes that it was George Rusk, not plaintiff, who disclosed this information to the

OIG, not the NYSTA. Finally, there is nothing in the record that plaintiff can point to to

support the conclusion that John Barr, who was responsible for plaintiff's termination,

was aware of plaintiff's complaint. Accordingly, for the foregoing reasons, this Court

recommends that defendants' motion for summary judgment on plaintiff's section 75-b

claim be granted.


**Labor Law § 201-d**

By his fourth cause of action, plaintiff asserts that defendants retaliated

against him because he participated in activities associated with his membership in the

Republican Party in violation of Labor Law 201-d. Defendants claim that by electing to

bring a claim under Civil Service Law § 75-b, plaintiff waived any other duplicative state-

law cause of action based upon retaliation.  Dkt. #56, p.30.  Notwithstanding the

foregoing, the New York Court of Claims has exclusive jurisdiction over a Labor Law

201-d claim against state authorities and defendants in their official capacity.

Therefore, any claim would necessarily have to be against the defendants in their

individual capacity.  None of the individual defendants terminated plaintiff, John Barr did

based on the OIG's investigation and its finding that plaintiff abused NYSTA time and

resources for his own business interest and gain.  Finally, plaintiff did not engage in

political activities as defined by the statute and there is no allegation that plaintiff was

terminated because of any such activities.  Political activities are defined as follows: "(i)

running for office, (ii) campaigning for a candidate for public office, or (iii) participating in

fund-raising for the benefit of a candidate, political party or political advocacy group."

N.Y. Labor Law § 201-d(1)(a).  The evidence before this Court is that plaintiff's political

affiliation was never discussed and there is nothing, besides plaintiff's speculation, that

it played a role in John Barr's decision to terminate plaintiff.  Accordingly, for the

foregoing reasons, plaintiff's Labor Law § 201-d claim fails as a matter of law and this

Court recommends that defendants' motion for summary judgment be granted.

## CONCLUSION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (Dkt. #46) be denied and defendants' motion for summary judgment (Dkt. #47) be granted in its entirety.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b)(2) and Local Rule 72.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72 of the Local Rules for the Western District of New York, "written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection, and shall be supported by legal authority." **Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection.**

In accordance with the requirements set forth in Local Rule 72, "[a]ny party filing objections to a Magistrate Judge's order or recommended disposition must include with the objections to the District Judge a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge."

**Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection.**

SO ORDERED.

DATED:        Buffalo, New York
              March 31, 2014

                                  *s/ H. Kenneth Schroeder, Jr.*
                                  **H. KENNETH SCHROEDER, JR.**
                                  **United States Magistrate Judge**